

# NUMBER 13-18-00579-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RODERICK DESHUN TURNER,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

### On appeal from the 85th District Court
### of Brazos County, Texas.

# MEMORANDUM OPINION ON REHEARING[1]

### Before Chief Justice Contreras and Justices Benavides and Longoria
### Memorandum Opinion by Justice Longoria

---

[1] Turner filed a motion for rehearing. *See* TEX. R. APP. P. 49.7. On the panel's own motion it withdraws its initial memorandum opinion and judgment and replaces them with the instant memorandum opinion and accompanying judgment. Turner's motion for rehearing is denied.

Appellant Roderick Deshun Turner appeals his conviction for burglary of a habitation, a second-degree felony. *See* TEX. PENAL CODE ANN. § 30.02(c)(2). Turner argues that the evidence was legally insufficient to convict him. We affirm.

## I. BACKGROUND[2]

Robert Parnell, a 911 dispatcher, testified that on March 7, 2015, at approximately 2:00 a.m., Ashley Taylor called 911 complaining that Turner, her ex-boyfriend, was banging on her door and window attempting to gain access to her apartment. Taylor requested that the police come to her apartment to make Turner leave. The police were dispatched. During the call, Parnell asked Taylor if she wanted a criminal trespass warning issued, which means that the police would inform Turner that he is not welcome at her address and he would be subject to arrest if he was located there again. Parnell testified, and his notes from the 911 call stated, that Taylor wanted a criminal trespass warning issued.

Cindy Synwolt, also a 911 dispatcher, testified that on March 8, 2015, at approximately 2:15 p.m., a call came through to a different dispatcher from a cell phone on an "open line," which means that no one is talking, but that the call is connected. After the call disconnected, the dispatcher unsuccessfully attempted to call the phone back. Shortly after, the same dispatcher received a call from a "maintenance man who had been notified by a neighbor of the victim of the incident that there was a man at the door yelling." Five minutes after the initial call, Synwolt then received another call from Taylor using the same cell phone number that placed the first call. Synwolt testified that Taylor was frantic, emotional, and sounded scared. During the 911 call, Synwolt could hear a man in the

---

[2] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

background with Taylor. The recorded call was admitted into evidence and played for the jury. Taylor told Synwolt that her ex-boyfriend had entered her apartment and assaulted her in front of their daughter. Taylor said that he was still in the apartment and that she could not get away from him. Synwolt suggested that Taylor retreat to the bathroom, but Taylor said she was unable to do so because the door did not lock. Synwolt remained on the line with Taylor until the police arrived.

Matthew Alaniz, a corporal with the College Station Police Department, was the first officer to arrive on the scene. At the time of the incident on March 8, Alaniz had an officer recruit with him. Alaniz said that as he approached Taylor's residence, he noticed the door was slightly open and the doorframe had been cracked. Alaniz testified that the cracked doorframe is usually indicative of forced entry and that there were small fragments of the doorframe in the entryway. He also testified that there was a footprint near the doorknob, which to him meant that someone had tried to forcefully kick open the door. Images of the doorframe, doorknob, and entryway were admitted and shown to the jury.

As Alaniz and his recruit approached the doorway, he could hear some "back and forth argument from inside" the apartment. Alaniz ordered Turner to step outside, and when he did not immediately do so, Alaniz physically removed him from the apartment. Alaniz described Taylor as emotional, afraid, and scared. He described Turner as angry, both at the officers and at Taylor. Sergeant Robert Greenawalt and another recruit arrived on the scene. At this point, Greenawalt removed Turner from the area and handcuffed him before placing him into a patrol unit.

Once Turner had been removed from the scene, Alaniz spoke with Taylor. He observed that Taylor had some redness on her face, a broken and bloody fingernail, and some of her hair had been pulled out. Taylor told Alaniz that Turner had been banging on her door to gain access to the apartment because he wanted to see their daughter. Once Turner gained access into the apartment, he immediately began to strike Taylor with an open hand on her face and neck. Alaniz located a dental retainer on the bathroom floor that Taylor said came out when Turner struck her in the mouth after she attempted to retreat into the bathroom. An audio recording of her statement to Alaniz was played for the jury. Taylor stated that she attempted to dial 911 once, but that Turner took her phone. She was able to get her phone back and dial 911. Taylor explained that Turner came into her apartment and immediately started "punching [her] face, pushing [her], slapping [her]" and she attempted to run to the bathroom to lock the door and get away from him, but that Turner got into the bathroom and continued to assault her. She further stated that Turner "pulled out [her] hair" and slapped her in the face. Alaniz testified that Taylor indicated that Turner had kicked in the door, but he could not recall if she specifically said those words to him. Alaniz believed that Turner forced his way in based on the broken doorframe.

Greenawalt also testified that he was dispatched to a civil disturbance call at Taylor's apartment. Alaniz was already approaching the apartment when Greenawalt arrived. As Greenawalt approached the apartment, he could hear shouting and verbal commands from Alaniz, which caused him to hurry toward the apartment to determine what was happening. Greenawalt saw Turner, agitated and aggressive, attempting to push past Alaniz to get into the apartment. Greenawalt and his recruit immediately

4

removed Turner from the doorway and placed him against the wall. Turner continued to struggle with the officers and tried to break free from their hold. Greenawalt removed his taser and placed it onto Turner's lower back while advising Turner to stop resisting, without discharging the taser. Turner was then able to be handcuffed. He was then escorted to the patrol vehicle and placed in the backseat.

Prior to trial, Taylor signed a non-prosecution affidavit and submitted it to the Brazos County District Attorney's Office. The State had to subpoena Taylor to testify because she no longer wished to move forward with the charges against Turner, the father of her children.

Taylor testified that on March 7, 2015, Turner showed up at her apartment around 2:00 a.m. wanting to get inside. She stated that he was banging on the door, demanding to be let inside. She told Turner to leave, and she called the police, but she could not recall if she requested a criminal trespass warning to be issued. She said that maintenance had to come out to repair the door, but that the door was able to be "closed and shut and locked." The next day, March 8, 2015, around 2:16 p.m., there was a loud banging on Taylor's door, enough to shake the picture on her wall. When she heard the banging, she went and opened the door and before she could say anything, Turner immediately started slapping her in the face. As a result of the banging on the door that afternoon, Taylor's door and doorframe were damaged to the point that she was unable to close and lock her door after she opened it. Taylor recalled that, at some point, her daughter came out of the bedroom and saw what was happening, but that she told her to go back to her room. Taylor later discovered that her daughter attempted to call Taylor's mother through her iPad for help.

5

Taylor attempted to get away from Turner and threatened to call 911, but she was unable to get to her phone. She could not recall if Turner took her phone away from her. During the altercation, she broke a fingernail; she believed it could have happened either when she attempted to protect herself from his hands or when she tried to get her phone to call 911. Eventually she was able to get to her phone and called 911. The police came and arrested Turner. Shortly after the incident, Taylor learned that she was pregnant with Turner's second child and decided to sign a non-prosecution affidavit in order to help Turner.

On cross-examination, Taylor stated that Turner was kicking her door, but she did not state that he ever kicked in the door. She said that she let Turner into her apartment voluntarily; he did not break in. Taylor stated that she consented to Turner being there, but that she did not consent to being assaulted.

Alison Pourteau, a licensed counselor, testified that she worked with victims of domestic violence. Pourteau stated that it was common for victims of domestic violence to file non-prosecution affidavits after an incident because they want to minimize the punishment for the abuser. She agreed that pregnancy can cause a woman to not want to go forward with charges against the father. Pourteau testified that she was present when Taylor testified, and that while she believed Taylor's testimony, she felt it was possible that Taylor was minimizing Turner's behavior to protect him to some extent, even though she admitted he assaulted her.

The trial court denied Turner's motion for directed verdict. The jury found Turner guilty of burglary of a habitation. With a felony enhancement, the trial court assessed punishment at twenty years' incarceration. This appeal followed.

## II. LEGAL SUFFICIENCY

By his sole issue, Turner argues that there was legally insufficient evidence to prove that he entered Taylor's apartment without her consent, as required by § 30.02 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 30.02(a)(1).

### A. Standard of Review and Applicable Law

The standard for reviewing the sufficiency of the evidence is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) ("[T]he *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt). We must view "the evidence in the light most favorable to the verdict." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This Court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally," and we must "defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (internal citations omitted). The key question is whether "the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016).

Legal sufficiency of the evidence "is measured by the elements of the offense as defined by the hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240

(Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

As correctly set forth in the charge to the jury, a person commits the offense of burglary of a habitation if, without the effective consent of the owner, he (a) enters a habitation with intent to commit an assault; or (b) enters a habitation and commits or attempts to commit an assault. *See* TEX. PENAL CODE ANN. § 30.02. A person charged with burglary under § 30.02(a)(1) is guilty of that offense the moment that he crosses the threshold of a habitation without consent and with the intent to commit the underlying felony. *Id*.; *see also Morgan*, 501 S.W.3d at 90.

## B. Analysis

Turner disputes the element of lack of consent. Essentially, his argument is based on Taylor's testimony that she consented to Turner being in her apartment and, absent proof that Turner entered without the effective consent of Taylor, his burglary conviction cannot stand. *See* TEX. PENAL CODE ANN. § 30.02. The State responds that Taylor's testimony on the day of trial differed from her previous statements which indicate she did not give her effective consent the day of the incident.

"Effective consent is defined as assent in fact, whether express or apparent, and includes assent by a person legally authorized to act for the owner." *Mims v. State*, 434 S.W.3d 265, 273 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see* TEX. PENAL CODE ANN. §§ 1.07(a)(11), (19), 31.01(3). Whether a defendant had effective consent to enter "must be measured at the time of the accused's alleged criminal act." *Morgan*, 501

8

S.W.3d at 92 (holding that a boyfriend who previously had access to property nevertheless entered without effective consent when property owner's testimony "made it clear that, at the time of the offense, she and [defendant] had been arguing [and she] had locked him out of the apartment").

The State relies on *Rangel v. State* to support its proposition that the jury was free to disbelieve Taylor's testimony at trial that she consented to Turner being in her apartment, and to instead believe that Turner did not have permission to be in the apartment based on Taylor's 911 calls and interviews with police, the circumstances surrounding the incident, the testimony of the officers and the domestic violence counselor, and the damage to the door and doorframe. 179 S.W.3d 64, 69 (Tex. App.— San Antonio 2005, pet. ref'd). In *Rangel*, the appellant argued that the State failed to prove he entered without consent based on the homeowner's testimony at trial that Rangel "always had permission" to enter her home. *Id*.

> According to [the homeowner], when Rangel began banging on the door, she did not want to open the door to him until [another man] left. When the State asked her about whether Rangel had permission on the morning of the incident to come inside, [the homeowner] testified that she "was going to open the door as soon as [another man] was out the back." [The homeowner] admitted that she gave a statement to the police the morning of the incident in which she stated, "There have been times when [Rangel] has been allowed to stay at my house, but he didn't have permission to come in the house today."

*Id.* The court in *Rangel* held that "the jury could have reasonably believed that [the homeowner's] statement the morning of the incident was truthful and that her testimony at trial that Rangel 'always had permission' to enter her home was not truthful." *Id.*

Here, the State asserts that Taylor similarly changed her testimony at the time of trial, and as in *Rangel*, the jury could have chosen to believe the earlier statements and

9

disbelieve the trial testimony. Turner argues that *Rangel* is distinguishable because, even prior to trial, Taylor did not specifically state that Turner was not allowed in her home. In its appellate brief, the State lists ample circumstantial evidence to argue that Taylor did not consent to Turner's entry into her apartment, including the following specific facts:

- Turner did not live in Taylor's apartment.

- The day before the incident, Turner attempted to gain access to Taylor's apartment by kicking in her door. Taylor refused to let him in and called 911, seeking a criminal trespass warning.

- Taylor's door was damaged, but temporarily repaired by maintenance before Turner returned to the apartment on March 8, 2015.

- Taylor blocked Turner's phone number after the first incident.

- When Turner returned on March 8, 2015, he kicked and banged on the door so hard that the pictures on the wall inside were shaking.

- The door was damaged beyond repair and needed to be replaced. And photographs showed a shoeprint next to the door handle, indicating the door had been kicked in an attempt to gain entry.

- When Taylor opened the door, she was unable to say anything to Turner because he immediately began attacking her.

- Taylor called 911 and can be heard yelling "you kicked down my door."

- The police officers testified that the door appeared to be kicked open and Alaniz inferred from his conversations with Taylor that Turner forced his way into the apartment.

10

- Taylor learned that she was pregnant with Turner's second child and, on the suggestion of Turner's counsel, signed a non-prosecution affidavit.

The State contends that the jury could infer from this evidence that Taylor did not give Turner consent to enter her home. Even though, unlike here, the homeowner in *Rangel* initially explicitly stated that Rangel was not given permission to enter her apartment, here, the jury was free to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing guilt of an actor. *See Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007).

> The issue on appeal is not whether we as a court believe the prosecution's evidence or believe that the defense evidence "outweighs" the State's evidence. If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds.

*Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984) (citing *Combs v. State*, 643 S.W.2d 709, 716 (Tex. Crim. App. 1982)). Viewing the evidence in the light most favorable to the verdict, including the incidents preceding the March 8 assault, the actions of Turner leading up to his eventual entry into the apartment, Taylor's emergency calls and attempt to retreat inside of the apartment, and her conversations with Alaniz, we conclude the jury could have reasonably believed that Turner entered Taylor's apartment without her effective consent and that her testimony to the contrary was not truthful. *Rangel*, 179 S.W.3d at 69. We overrule Turner's sole issue.[3]

---

[3] Turner also argues that the State "conflated the fact issues to be decided by the jury and the trial court erred by denying direct [sic] verdict on this theory of criminal liability." To this point, Turner argues that the State was allowed to represent to the jury that it could find Turner guilty if they believed he entered the bathroom of Taylor's apartment without her effective consent. However, having already determined that the jury could have reasonably believed that Turner's initial entrance into Taylor's apartment was without her effective consent, we need not address this point as it is not dispositive. *See* TEX. R. APP. P. 47.1. To the extent that Turner argues that the trial court erred in denying his directed verdict, he has not adequately briefed this issue on appeal as he has not provided any authority in support or presented any legal argument related to the denial of his request for a directed verdict. *See id*. 38.1. Further, to the extent

### III.     CONCLUSION

We affirm the judgment of the trial court.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
19th day of September, 2019.

---

that Turner argues that the State improperly discussed the bathroom entry in closing arguments, he has not preserved this issue for our review because he did not object to the State's argument. *See id*. 33.1.